## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

**CHAROLETTE BARNETT**      :
**821 Danza Road**      :
**Severn, MD 21144**      :
     :
       **Plaintiff,**      :
     :
       **v.**      :
     :
**UNIFORMED SERVICES UNIVERSITY**      :
**OF THE HEALTH SCIENCES**      :
**4301 Jones Bridge Road**      :
**Bethesda, MD 20814-4712**      :      **Civil Action No. _____**
     :
**THE HONORABLE ROBERT M. GATES**      :
**In his official capacity as**      :      **JURY TRIAL DEMANDED**
**Secretary of Defense**      :
**Washington Headquarters Services**      :
**1155 Defense Pentagon**      :
**Washington, DC 20301-1155**      :
     :
       **and**      :
     :
**THE CORBIN COMPANY**      :
**99 Canal Center Plaza, Suite 310**      :
**Alexandria, VA 22314**      :
     :
       **Defendants.**      :
     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

Plaintiff, Charolette Barnett ("Ms. Barnett" or "Plaintiff") was the victim of pregnancy and disability discrimination when she was denied a reasonable accommodation, converted from full-time to part-time employment status, terminated, and then denied re-hire by the Uniformed Services University of the Health Sciences ("USUHS") and the Corbin Company ("Corbin") (USUHS and Corbin hereinafter collectively referred to as "Defendants"). Accordingly, Plaintiff

brings this Complaint for declaratory and injunctive relief, and for economic and compensatory damages against both Defendants, and for punitive damages against Defendant Corbin, to redress the deprivation of rights secured to Plaintiff by the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), Section 504 of the Rehabilitation Act, as amended, 29 U.S.C. § 794 ("Rehabilitation Act"), and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA").

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331.

2.      As the unlawful employment practices complained of herein occurred within Montgomery County, Maryland, venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.      Plaintiff Charolette Barnett is a female citizen of the United States and resident of Anne Arundel County, Maryland.  Ms. Barnett was employed by Defendants between 2006 and 2008, and applied to Defendant USUHS for re-hire in September 2008.

4.      Defendant USUHS is a governmental entity operating under the auspices of the United States Department of Defense ("DOD") and is engaged in its business in the state of Maryland. Defendant USUHS is a medical school and research facility that educates members of the military and employees of the DOD.

5.      Defendant Corbin is a corporation registered in the State of Virginia and doing business in the State of Maryland.  Corbin contracts with USUHS and other government entities to provide personnel and other business support services.

## FACTS

### Ms. Barnett's Employment With Corbin and USUHS

6.      In September 2006, Ms. Barnett began working for USUHS through its contract with

Corbin, as a secretary in the USUHS Obstetrics & Gynecology (OBGYN) department.

7.      Ms. Barnett was supervised by USUHS employee Annette Mitchell ("Mitchell") and the

USUHS doctors in the OBGYN department.

8.      Ms. Barnett received her pay and benefits through Corbin, which she interacted with

through Corbin employee Rebecca Davis ("Davis").

9.      In her position at USUHS, Ms. Barnett performed typical secretarial duties.

10.     Ms. Barnett's job performance at USUHS was excellent; the doctors consistently praised

her work and she never received any complaints regarding the quality of her work.

11.     Starting early in Ms. Barnett's employment, Mitchell repeatedly stated her intent to

convert Ms. Barnett to full-time government employee status.

### Ms. Barnett's Pregnancy

12.     In August 2007, Ms. Barnett learned that she was pregnant and informed Mitchell of her

pregnancy shortly thereafter.

13.     Shortly after Ms. Barnett notified Mitchell of her pregnancy, Ms. Barnett endured

differential treatment based on her pregnancy and gender, including demeaning and offensive

remarks pertaining to her pregnancy.

14.     For example, upon learning of Ms. Barnett's pregnancy, Mitchell suddenly refused to

discuss converting Ms. Barnett to full-time government employee status.

15.     As soon as she learned Ms. Barnett was pregnant, Mitchell also began expressing highly

biased and stereotypical views of Ms. Barnett as a pregnant women.  For example, during a

meeting with Ms. Barnett and a coworker, Mitchell demanded to know whether Ms. Barnett intended to continue working during her pregnancy and thereafter.  Ms. Barnett responded that she did intend to work during her pregnancy and also planned to return to work as soon as possible after giving birth.  Mitchell responded by expressing her disapproval of Ms. Barnett's decisions to continue working during and after her pregnancy, and asked inappropriate questions regarding the views of Ms. Barnett's baby's father on the subject.  Ms. Barnett found these questions hostile and inappropriate.

16.     Shortly after Mitchell announced Ms. Barnett's pregnancy in front of the coworker, news of the pregnancy and the identity of her baby's father spread throughout the OBGYN department.

17.     Shortly after Mitchell announced Ms. Barnett's pregnancy, a second coworker told Ms. Barnett that Ms. Barnett was suffering from complications with her pregnancy (see ¶¶ 18-21 below) because she was pregnant with a "Demon's seed."  The coworker made this statement in Mitchell's presence, and Mitchell did nothing to stop the comment or reprimand the coworker.

## Ms. Barnett's Disability

18.     Shortly after she became pregnant, Ms. Barnett was diagnosed with severe Hyperemesis Gravidarum ("Hyperemesis"), a rare condition that made her unable to ingest or digest food or liquids due to severe nausea and vomiting, and resulted in pain, malnourishment, muscle weakness, dizziness and other symptoms related to her body's inability to ingest calories or nutrients.

19.     Ms. Barnett informed Mitchell that she had been diagnosed with Hyperemesis Gravidarum shortly after she received the diagnosis herself.

20.     Ms. Barnett's Hyperemesis became so severe that in October 2007 she had a peripherally

inserted central catheter ("PICC") line surgically inserted to provide her and her unborn child with nutrients and nourishment. The PICC line and equipment were portable and designed to allow Ms. Barnett to continue working.

21.     Prior to having the PICC line inserted, despite experiencing severe symptoms of Hyperemesis, Ms. Barnett continued coming to work and remained hopeful that she could continue working throughout her pregnancy.

### Ms. Barnett's Request for a Reasonable Accommodation

22.     However, shortly after the PICC line was inserted, Ms. Barnett's doctor determined that her condition had worsened such that she could not return to work pending improvement.

23.     Ms. Barnett informed Mitchell and Davis of her doctor's determination that she could not return to work pending improvement. Ms. Barnett made clear that her condition required a temporary, short-term leave of absence from work. She made clear to Mitchell and Davis that she intended to return to work as soon as her condition improved, which at the very latest would be shortly after she gave birth. In response, Mitchell and Davis expressed a willingness to accommodate Ms. Barnett's disability and assured her that her position would be waiting for her as soon as her condition improved.

24.     Ms. Barnett stayed in regular contact with both USUHS and Corbin while out on leave.

25.     For example, Ms. Barnett was in contact with Davis shortly after going out on leave and worked with Davis to apply for short-term disability benefits through Corbin's disability benefits program.

26.     Ms. Barnett's condition continued to worsen, and in January 2008 her doctor placed her on mandatory bed rest for the duration of her pregnancy.

27.     Ms. Barnett informed Davis and Mitchell of her worsening condition and her intent to

return to work as soon as possible after she gave birth.  In response, Mitchell and Davis again

assured Ms. Barnett that her position would be waiting for her when she could return.

28.     In January 2008, Davis told Ms. Barnett that Corbin did not want to continue paying for

Ms. Barnett's health insurance, and that therefore Corbin intended to convert Ms. Barnett from

full-time to part-time employment status so that she would no longer be eligible to participate in

Corbin's employer-sponsored health insurance benefits.  Davis again assured Ms. Barnett that

the conversion would not impact her job security, and that she would be reinstated to full-time

status with full benefits as soon as she could return to work.

29.     Ms. Barnett received a letter dated January 29, 2008, announcing Corbin's conversion of

her from full-time to part-time status, and her Corbin-sponsored health insurance was cut off

shortly thereafter.

30.     As a result of the termination of her health insurance, Ms. Barnett was forced to apply for

state-funded health insurance and switch health care providers in the middle of her high-risk

pregnancy.

31.     Having her health insurance cut off and being forced to switch health care providers

caused Ms. Barnett extreme emotional distress, including fear for her own health and the health

of her unborn baby.

32.     Ms. Barnett continued to inform Davis and Mitchell of her health status and her intent to

return to work shortly after she gave birth.  In response, Mitchell and Davis continued to assure

Ms. Barnett that her position would be waiting for her when she returned.

## Ms. Barnett's Termination

33.     Without warning and contrary to Defendants' assurances that her job would be waiting

for her when she returned, and contrary to the January 29, 2008 letter converting her to part-time

status, Corbin sent Ms. Barnett a letter dated April 9, 2008, stating that her last day of employment with Corbin had been October 26, 2007.  The letter further stated that Ms. Barnett's position had been filled by a new hire on March 3, 2008.

34.     Upon information and belief, the individual who Corbin and USUHS hired to fill Ms. Barnett's position neither was pregnant nor suffered from a disability.

35.     The termination of her employment caused Ms. Barnett extreme emotional distress, including feelings of sadness, devastation, and mistrust.  She cried frequently and felt, and continues to feel depressed.

36.     Despite diligent efforts by Ms. Barnett, she has been unable to find new employment, which has caused additional emotional and financial distress as she attempts to raise her young children.

**Ms. Barnett's Subsequent Application for Employment**

37.     In September 2008, Ms. Barnett learned that her prior position at USUHS was vacant again, and she applied immediately.

38.     Ms. Barnett subsequently called Mitchell to follow up on her application.  Mitchell responded that she was reluctant to even consider Ms. Barnett for the job because of Ms. Barnett's disability and the complications presented by Ms. Barnett's need for childcare for her young children.

39.     Ms. Barnett assured Ms. Mitchell that she was healthy and that childcare would not be a problem.

40.     Ms. Barnett later received notice that she was not selected for the position.

41.     USUHS refusal to hire her caused Ms. Barnett extreme emotional distress, including feelings of rejection, confusion, sadness, and disbelief.

42.     Upon information and belief, the individual who USUHS hired to fill the position did not have a disability.

43.     Despite diligent subsequent efforts to find new employment, Ms. Barnett remains unemployed.

## USUHS and Corbin Were Ms. Barnett's Joint Employers

44.     Corbin and USUHS functioned as an integrated enterprise and shared and co-determined the essential terms of Ms. Barnett's employment and, therefore, were joint-employers of Ms. Barnett.

45.     For example, throughout Ms. Barnett's employment at USUHS:

     a.      USUHS personnel interviewed and hired Ms. Barnett, and only used Corbin to create the false impression that Ms. Barnett was not a de facto federal employee;

     b.      Throughout Ms. Barnett's tenure at USUHS, only USUHS personnel supervised Ms. Barnett;

     c.      Ms. Barnett's job was as a secretary in the USUHS OBGYN department, which performs part of the regular business of USUHS;

     d.      USUHS employees served as Ms. Barnett's direct supervisors, and controlled the means and manner by which Ms. Barnett performed her work, including directing Ms. Barnett's specific day-to-day duties and tasks, determining how the assigned tasks were to be performed, and answering substantive questions regarding Ms. Barnett's work;

     e.      USUHS furnished all of the tools, materials and equipment that Ms. Barnett used, including her workspace, chair, desk and computer;

     f.      USUHS created the procedures Ms. Barnett followed in performing her job;

     g.      USUHS employee Mitchell approved Ms Barnett's timesheets, which Mitchell

submitted to Corbin;

h.      If Ms. Barnett needed to sick or vacation leave, she was told to inform and received permission from USUHS employee Mitchell, not Corbin;

i.      If Ms. Barnett came to the limit of the hours authorized by the Corbin-USUHS contract, she informed USUHS employee Mitchell, who contacted Corbin to request additional hours;

j.      Ms. Barnett was tasked with working full-time within the OBGYN department at USUHS, and was not assigned to work for any other Corbin client;

k.      Ms. Barnett performed the same duties and in the same manner as colleagues who were full-time government employees;

l.      USUHS did not have a separate section for contract employees to sit or to get supplies;

m.      Upon information and belief, Ms. Barnett's pay was set at a level comparable to that of a similarly-situated government employee; and

n.      Upon information and belief, Ms. Barnett's former position was at some after Ms. Barnett's termination formally converted to a federal government position.

46.     For further example, throughout Ms. Barnett's employment with Corbin:

a.      Corbin paid Ms. Barnett's salary and provided her employment benefits, including health-care, retirement and other employment benefits pursuant to contracts between Corbin and USUHS;

b.      Corbin provided, received and reviewed Ms. Barnett's timesheets;

c.      Corbin paid Ms. Barnett based on hours worked, not on a piecemeal or project basis;

     d.     Corbin sent Ms. Barnett the letters concerning the changes of her employment status.

47.     For further example, both Corbin and USUHS had the authority to terminate Ms. Barnett.

## Exhaustion of Administrative Remedies

48.     Despite its status as her joint employer, USUHS never notified Ms. Barnett of the process for filing a charge of discrimination against USUHS.  Thus, Ms. Barnett initially filed a charge of discrimination against Corbin only with the U.S. Equal Opportunity Employment Commission (EEOC) and the Office of Human Rights of Montgomery County, Maryland, on October 7, 2008 (Charge No. 570-2008-01611).

49.     Upon learning about the process for initiating a discrimination complaint against USUHS, Ms. Barnett promptly filed a charge of discrimination against USUHS with the USUHS Equal Employment Opportunity Office on March 26, 2009 (EEO Complaint No. US-09-001).

50.     Ms. Barnett also amended EEOC Charge No. 570-2008-01611 on May 21, 2009 to include USUHS as a Respondent.

51.     Plaintiff received a Right to Sue letter for EEOC Charge No. 570-2008-01611 dated June 30, 2010 (attached hereto as Exhibit A).

52.     Plaintiff received a Final Agency Decision for EEO Complaint No. US-09-001 from the USUHS EEO Office dated July 12, 2010 (attached hereto as Exhibit B).

## COUNT ONE (USUHS)
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## DISCRIMINATION – TERMINATION BASED ON PREGNANCY AND GENDER

53.     The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

54.     Defendant USUHS violated Title VII by terminating Plaintiff on account of her pregnancy and gender.

55.     Defendant USUHS is an employer within the meaning of Title VII.

56.     Plaintiff was an employee of Defendant USUHS within the meaning of Title VII.

57.     Plaintiff is a member of a class protected by Title VII in that she is a woman, and at all relevant times Plaintiff was a member of a class protected by Title VII in that she was pregnant.

58.     Plaintiff suffered an adverse employment action when she was terminated.

59.     As a result of this discrimination, Plaintiff has suffered significant harm for which she should be compensated.

**COUNT TWO (USUHS)**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**DISCRIMINATION – REFUSAL TO HIRE BASED ON GENDER**

60.     The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

61.     Defendant USUHS violated Title VII by refusing to hire Plaintiff in September 2008 on account of her gender.

62.     Defendant USUHS is an employer within the meaning of Title VII.

63.     Plaintiff was an employee of Defendant USUHS within the meaning of Title VII.

64.     Plaintiff is a member of a class protected by Title VII in that she is a woman.

65.     Plaintiff suffered an adverse employment action when Defendant USUHS refused to hire her.

66.     As a result of this discrimination, Plaintiff has suffered significant harm for which she should be compensated.

**COUNT THREE (USUHS)**
**VIOLATION OF THE REHABILITATION ACT**
**DISCRIMINATION – TERMINATION AND REFUSAL TO HIRE BASED ON**
**DISABILITY**

67.     The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

68.     Defendant USUHS violated the Rehabilitation Act by terminating Plaintiff on account of

her disability or, in the alternative, on account of her record of being disabled or, in the alternative, because USUHS regarded Plaintiff as disabled.

69.     Defendant USUHS violated the Rehabilitation Act by refusing to hire Plaintiff in September 2008 on account of her record of being disabled or, in the alternative, because USUHS regarded Plaintiff as disabled.

70.     Defendant USUHS is an employer within the meaning of the Rehabilitation Act.

71.     Plaintiff was an employee of Defendant USUHS within the meaning of the Rehabilitation Act.

72.     At all relevant times, Plaintiff was a qualified individual with a disability or, in the alternative, had a record of being disabled or, in the alternative, was regarded by USUHS as disabled, within the meaning of the Rehabilitation Act.

73.     Plaintiff suffered adverse employment actions when she was terminated and when USUHS refused to hire her.

74.     As a result of this discrimination, Plaintiff has suffered significant harm for which she should be compensated.

### COUNT FOUR (USUHS)
### VIOLATION OF THE REHABILITATION ACT
### DISCRIMINATION – REFUSAL TO PROVIDE A REASONABLE ACCOMMODATION

75.     The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

76.     Defendant USUHS violated the Rehabilitation Act by refusing to provide Plaintiff with the reasonable accommodation of a leave of absence from her position.

77.     Defendant USUHS is an employer within the meaning of the Rehabilitation Act.

78.     Plaintiff was an employee of Defendant UHUHS within the meaning of the Rehabilitation Act.

79.     At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the Rehabilitation Act.

80.     Plaintiff requested the reasonable accommodation of a leave of absence from her position.

81.     As a result of Defendant's refusal to provide a reasonable accommodation, Plaintiff has suffered significant harm for which she should be compensated.

## COUNT FIVE (CORBIN)
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### DISCRIMINATION – CONVERSION FROM FULL-TIME TO PART-TIME STATUS AND TERMINATION BASED ON PREGNANCY AND GENDER

82.     The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

83.     Defendant Corbin violated Title VII by converting Plaintiff from full-time to part-time employment status on account of her pregnancy and gender.

84.     Defendant Corbin violated Title VII by terminating Plaintiff on account of her pregnancy and gender.

85.     Defendant Corbin is an employer within the meaning of Title VII.

86.     Plaintiff was an employee of Defendant Corbin within the meaning of Title VII.

87.     Plaintiff is a member of a class protected by Title VII in that she is a woman, and at all relevant times Plaintiff was a member of a class protected by Title VII in that she was pregnant.

88.     Plaintiff suffered adverse employment actions when she was converted from full-time to part-time status and terminated.

89.     In converting Plaintiff from full-time to part-time status and terminating her, Defendant Corbin acted with malice or reckless indifference to Plaintiff's federally-protected rights.

90.     As a result of this discrimination, Plaintiff has suffered significant harm for which she should be compensated.

**COUNT SIX (CORBIN)**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**DISCRIMINATION – REFUSAL TO PROVIDE A REASONABLE**
**ACCOMMODATION**

91.      The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

92.      Defendant Corbin violated the ADA by refusing to provide Plaintiff with the reasonable

accommodation of a leave of absence from her position.

93.      Defendant Corbin is an employer within the meaning of the ADA.

94.      Plaintiff was an employee of Defendant Corbin within the meaning of the ADA.

95.      At all relevant times, Plaintiff was a qualified individual with a disability within the

meaning of the ADA.

96.      Plaintiff requested the reasonable accommodation of a leave of absence from her

position.

97.      In refusing to provide Plaintiff with a reasonable accommodation, Defendant Corbin

acted with malice or reckless indifference to Plaintiff's federally-protected rights.

98.      As a result of Defendant's refusal to provide a reasonable accommodation, Plaintiff has

suffered significant harm for which she should be compensated.

**COUNT SEVEN (CORBIN)**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**DISCRIMINATION - CONVERSION FROM FULL-TIME TO PART-TIME STATUS**
**AND TERMINATION BASED ON DISABILITY**

99.      The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

100.     Defendant Corbin violated ADA by converting Plaintiff from full-time to part-time

employment status on account of her disability.

101.     Defendant Corbin violated the ADA by terminating Plaintiff on account of her disability.

102.     Defendant Corbin is an employer within the meaning of the ADA.

14

103.    Plaintiff was an employee of Defendant Corbin within the meaning of the ADA.

104.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA.

105.    Plaintiff suffered adverse employment actions when she was converted from full-time to part-time status and terminated.

106.    In converting Plaintiff from full-time to part-time status and terminating her, Defendant Corbin acted with malice or reckless indifference to Plaintiff's federally-protected rights.

107.    As a result of this discrimination, Plaintiff has suffered significant harm for which she should be compensated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment against Defendants and:

(a)    Find that the acts and practices complained of herein are in violation of Title VII, the Americans With Disabilities Act, and the Rehabilitation Act;

(b)    Award Plaintiff all earnings and other job benefits she would have received but for Defendants' discriminatory treatment, including, but not limited to, lost wages, pension, bonuses, and other benefits;

(c)    Award Plaintiff compensatory damages in an amount to be shown at trial, including past and future economic and non-economic losses, including extreme emotional distress and mental anguish; impairment of quality of life; and consequential losses;

(d)    Award Plaintiff punitive damages against Defendant Corbin in an amount to be proved at trial;

(e)    Award pre-judgment and post-judgment interest;

(f)     Issue an injunction ordering Defendants to reinstate Plaintiff to a position Plaintiff would

have attained but for Defendants' discriminatory and retaliatory conduct; or, in the alternative,

front pay;

(g)     Award Plaintiff her attorneys' fees and cost of suit; and

(h)     Grant such other relief as the Court may deem just and proper.


## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury in this action.



Respectfully submitted,


_____/s/_____

Susan E. Huhta (D.Md. Bar No. 14547)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 300
Washington, D.C. 20036
Tel: (202) 319-1000
Fax: (202) 319-1010
e-mail: susan_huhta@washlaw.org



_____/s/_____

Emily B. Read (D.Md. Bar No. 17700)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 300
Washington, D.C. 20036
Tel: (202) 319-1000
Fax: (202) 319-1010
e-mail: emily_read@washlaw.org

Steven G. Reade*
Marco A. Palmieri*
Giselle K. Fuentes*
Arnold & Porter LLP
555 12th Street N.W.
Washington, D.C. 20004
Tel: (202) 942-5000
Fax: (202) 942-5999
e-mail: steven_reade@aporter.com

*Motions for *pro hac vice* admission forthcoming.

*Counsel for Plaintiff Charolette Barnett*

Date: September 27, 2010